# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
ORANGE COUNTY

-----------------------------------------------------------------------X

ELVIA COLLART, DIANE DELFINI, CURLIE
DILLARD, CEKII EDWARDS, MARK JONES, ANGEL
MAJANO AND ANGELY MAJANO,

                      *Plaintiff,*

-*against* -

THE PORT AUTHORITY OF NEW YORK AND NEW
JERSEY, THE 3M COMPANY, f/k/a Minnesota Mining
and Manufacturing Co., AGC CHEMICALS AMERICAS
INC., AMEREX CORPORATION, ARKEMA INC.,
ARCHROMA U.S. INC., BASF CORPORATION,
individually and as successor in interest to Ciba Inc.,
BUCKEYE FIRE EQUIPMENT COMPANY, CARRIER
GLOBAL CORPORATION, CHEMDESIGN PRODUCTS
INC., CHEMGUARD INC. CHEMICALS, INC.,
CLARIANT CORPORATION, individually and as
successor in interest to Sandoz Chemical Corporation,
CORTEVA, INC., individually and as successor in interest
to DuPont Chemical Solutions Enterprise, DEEPWATER
CHEMICALS, INC., DUPONT DE NEMOURS INC.,
individually and as successor in interest to DuPont
Chemical Solutions Enterprise, DYNAX CORPORATION,
E. I. DUPONT DE NEMOURS AND COMPANY,
individually and as successor in interest to DuPont
Chemical Solutions Enterprise, KIDDE-FENWAL, INC.,
individually and as successor in interest to Kidde Fire
Fighting, Inc., NATION FORD CHEMICAL COMPANY,
NATIONAL FOAM, INC., THE CHEMOURS
COMPANY, individually and as successor in interest to
DuPont Chemical Solutions Enterprise, THE CHEMOURS
COMPANY FC, LLC, individually and as successor in
interest to DuPont Chemical Solutions Enterprise, and
TYCO FIRE PRODUCTS, LP, individually and as
successor in interest to The Ansul Company, and JOHN
DOE DEFENDANTS 1-20,

                      *Defendants.*

-----------------------------------------------------------------------X

Index No. _____/2022

**SUMMONS**

Venue is designated pursuant to
CPLR § 503(a) & (c) in that
ORANGE in this county.

To the above-named Defendant:

You are hereby summoned to answer the Complaint in this action, and to serve a copy of your Answer, or, if the Complaint is not served with this Summons, to serve a Notice of Appearance on the Plaintiffs' attorneys within twenty (20) days after the service of this Summons, exclusive of the day of service, where service is made by delivery upon you personally within the state, or, within thirty (30) days after completion of service where service is made in any other manner. In case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the Complaint.

Dated: New York, New York
April 1, 2022

Napoli Shkolnik, PLLC
*Attorneys for Plaintiff*

_____
Patrick Lanciotti, Esq.
360 Lexington Avenue
Eleventh Floor
New York, NY 10017

To:

THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY
4 World Trade Center
150 Greenwich Street, 23rd Floor
New York, New York 10007

3M COMPANY
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, New Castle, DE 19808

AGC CHEMICALS AMERICAS INC.
c/o The Corporation Trust Company
Corporation Trust Center

1209 Orange Street
Wilmington, DE 19801

AMEREX CORPORATION
c/o James M. Proctor II
2900 Highway 280
Suite 300
Birmingham, AL 35223

ARCHROMA U.S. INC.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

ARKEMA INC.
900 First Avenue
King of Prussia, PA 19406

BASF CORPORATION
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

BUCKEYE FIRE EQUIPMENT COMPANY
c/o A Haon Corporate Agent, Inc.
29225 Chagrin Blvd, Suite 350
Pepper Pike, OH 44122

CARRIER GLOBAL CORPORATION
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

CHEMDESIGN PRODUCTS INC.
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, New Castle, DE, 19808

CHEMGUARD INC.
c/o The Prentice-Hall Corporation System, Inc.
251 Little Falls Drive
Wilmington, New Castle, DE, 19808

CHEMICALS, INC.
c/o Ashok K. Moza
12321 Hatcherville
Baytown, TX 77520

CLARIANT CORPORATION
c/o Corporation Service Company
8040 Excelsior Drive, Suite 400
Madison, WI 53717

CORTEVA, INC.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

DEEPWATER CHEMICALS, INC.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

DUPONT DE NEMOURS INC.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

DYNAX CORPORATION
c/o Corporate Systems LLC
3500 S. Dupont Highway
Dover, DE 19901

Case 1:22-cv-04234-PAE   Document 1-1   Filed 05/23/22   Page 6 of 67

E. I. DUPONT DE NEMOURS AND COMPANY
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

KIDDE-FENWAL, INC.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

NATION FORD CHEMICAL COMPANY
c/o John A. Dickson, IV
2300 Bank Street
Fort Mill, SC 29715

NATIONAL FOAM, INC.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

THE CHEMOURS COMPANY
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

THE CHEMOURS COMPANY FC, LLC
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

TYCO FIRE PRODUCTS LP
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

SUPREME COURT OF THE STATE OF NEW YORK
ORANGE COUNTY
-----------------------------------------------------------------------X
ELVIA COLLART, DIANE DELFINI, CURLIE
DILLARD, CEKII EDWARDS, MARK JONES, ANGEL
MAJANO AND ANGELY MAJANO,

         *Plaintiffs,*

-against -

THE PORT AUTHORITY OF NEW YORK AND NEW
JERSEY, THE 3M COMPANY, f/k/a Minnesota Mining
and Manufacturing Co., AGC CHEMICALS AMERICAS
INC., AMEREX CORPORATION, ARKEMA INC.,
ARCHROMA U.S. INC., BASF CORPORATION,
individually and as successor in interest to Ciba Inc.,
BUCKEYE FIRE EQUIPMENT COMPANY, CARRIER
GLOBAL CORPORATION, CHEMDESIGN
PRODUCTS INC., CHEMGUARD INC. CHEMICALS,
INC., CLARIANT CORPORATION, individually and as
successor in interest to Sandoz Chemical Corporation,
CORTEVA, INC., individually and as successor in interest
to DuPont Chemical Solutions Enterprise, DEEPWATER
CHEMICALS, INC., DUPONT DE NEMOURS INC.,
individually and as successor in interest to DuPont
Chemical Solutions Enterprise, DYNAX
CORPORATION, E. I. DUPONT DE NEMOURS AND
COMPANY, individually and as successor in interest to
DuPont Chemical Solutions Enterprise, KIDDE-
FENWAL, INC., individually and as successor in interest
to Kidde Fire Fighting, Inc., NATION FORD CHEMICAL
COMPANY, NATIONAL FOAM, INC., THE
CHEMOURS COMPANY, individually and as successor
in interest to DuPont Chemical Solutions Enterprise, THE
CHEMOURS COMPANY FC, LLC, individually and as
successor in interest to DuPont Chemical Solutions
Enterprise, TYCO FIRE PRODUCTS, LP, individually
and as successor in interest to The Ansul Company, and
JOHN DOE DEFENDANTS 1-20,

         *Defendants.*

-----------------------------------------------------------------------X

Index No. _____/2022

**SUMMONS**

Trial by jury is desired in the
County of Orange

**BASIS OF VENUE: CAUSE OF
ACTION AROSE IN ORANGE
COUNTY**

Plaintiffs, ELVIA COLLART, DIANE DELFINI, CURLIE DILLARD, CEKII EDWARDS, MARK JONES, ANGEL MAJANO, AND ANGELY MAJANO, by and through their undersigned counsel, hereby file this Complaint, makes these allegations based on information and belief and/or which are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery against Defendants, THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY, 3M COMPANY, f/k/a Minnesota Mining and Manufacturing Co., AGC CHEMICALS AMERICAS INC., AMEREX CORPORATION, ARKEMA INC., ARCHROMA U.S. INC., BASF CORPORATION, BUCKEYE FIRE EQUIPMENT COMPANY, CARRIER GLOBAL CORPORATION, CHEMDESIGN PRODUCTS INC., CHEMGUARD INC., CHEMICALS, INC., CLARIANT CORPORATION, CORTEVA, INC., DEEPWATER CHEMICALS, INC., DUPONT DE NEMOURS INC., DYNAX CORPORATION, E. I. DUPONT DE NEMOURS AND COMPANY, KIDDE-FENWAL, INC., NATION FORD CHEMICAL COMPANY, NATIONAL FOAM, INC., THE CHEMOURS COMPANY, THE CHEMOURS COMPANY FC, LLC, and TYCO FIRE PRODUCTS, LP, and DOE DEFENDANTS 1-20, fictitious names whose present identifies are unknown  (collectively "Defendants") and alleges, upon information and belief, as follows:

## I. INTRODUCTION

### A. The Contamination of the City of Newburgh

1.      The City of Newburgh (hereinafter the "City" or "City of Newburgh") is located in the County of Orange, State of New York.

2.      Lake Washington served as the primary water supply for the City of Newburgh at all times relevant, except when it was taken out of service due to the PFOS contamination.

3.      The Stewart International Airport is located approximately 2.5 miles west of the City of Newburgh.

4.      The Stewart International Airport is located upgradient from Lake Washington.

5.      The Stewart Air National Guard Base is located at the Stewart International Airport, located approximately 2.5 miles west of the City of Newburgh, New York.

6.      The Stewart Air National Guard Base and Stewart International Airport have used, stored, discharged, and released aqueous firefighting foams ("AFFF") and other materials containing perfluorooctanesulfonic acid ("PFOS") and related fluorochemicals that can degrade to perfluorooctanoic acid ("PFOA") or PFOS into the City of Newburgh's drinking water supply.

7.      Plaintiffs are residents of the State of New York that have been exposed to levels of PFOS greater than the national average as a result of the contamination of their water supply and have suffered injuries due to said contamination.

8.      The Stewart Air National Guard Base and Stewart International Airport have been linked to the contamination of surface and groundwater with PFOS, PFOA, and other perfluorinated chemicals ("PFCs") that serve the City of Newburgh's drinking water supply.

9.      PFOS and PFOA ("PFOS/A") that originated and was released from the Stewart Air National Guard Base and the Stewart International Airport has contaminated Lake Washington and its tributaries relied upon by the City of Newburgh.

10.     PFOS has been detected in levels exceeding the current EPA Health Advisory Limit of 70 parts per trillion (ppt) in Lake Washington, as well as groundwater samples collected from existing wells from the Stewart International Airport and Stewart Air National Guard Base.

11.     Plaintiffs are individuals that have been exposed to levels of PFOS substantially greater than the national average while living and/or working in the City of Newburgh as a result of the Port Authority's and manufacturing defendants' contamination of the City of Newburgh water supply and have suffered injuries due to their exposure.

Case 1:22-cv-04234-PAE   Document 1-1   Filed 05/23/22   Page 10 of 67

12.     Plaintiffs are individuals that have been exposed to levels of PFOS substantially greater than the national average while living and/or working in the City of Newburgh as a result of the Defendant City of Newburgh knowingly serving contaminated water to its paying customers in the City of Newburgh for at least three (3) years, and likely much longer.

13.     The Stewart Air National Guard Base and Stewart International Airport have been determined by the NYSDEC to be the cause the contamination of surface and groundwater with PFOA, PFOS and other PFCs that serve the City of Newburgh's drinking water supply.

14.     In August 2016, the NYSDEC declared the Stewart Air National Guard Base a State Superfund Site.

15.     As a result of the PFOS/A contamination of the City of Newburgh's drinking water supply, over 30,000 residents were unknowingly poisoned over many years.

**B. Health Effects of PFOS and PFOA Exposure.**

16.     PFOA, also known as C8 has been studied extensively by, among others, a Science Panel that was formed out of a class action settlement from a lawsuit arising from contamination from DuPont's Washington Works located in Wood County West Virginia. This panel consisted of three epidemiologists who were specifically tasked with determining whether there was a probable link between C8 and human diseases. The panel found probable links between   PFOA and kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, pregnancy induced hypertension (including preeclampsia), and hypercholesterolemia.

17.     Adverse health effects are the same for PFOA and PFOS.

**C. Port Authority of New York and New Jersey's Operation and Control of Stewart Air National Guard Base Since 2007.**

18.     Stewart International Airport is located on or about 1180 1st Street, New Windsor, New York.

Case 1:22-cv-04234-PAE Document 1-1 Filed 05/23/22 Page 11 of 67

19.    Stewart Air National Guard Base is adjacent to the Stewart International Airport but is part of the same property.

20.    Since 2007, Defendant Port Authority of New York and New Jersey (hereinafter the "Port Authority") has been the leasee, controller and operator of Stewart International Airport.

21.    The property was originally donated to the City of Newburgh in 1930 for use as a municipal airport.

22.    Prior to this, the property was used mostly for agricultural purposes.

23.    In 1941, the City turned over the land to the US Army for use as a flight training facility for the cadets at the United States Military Academy at West Point, New York.

24.    In 1948, the US Army transferred much of the Stewart Air National Guard Base to the US Air Force.

25.    The aviation facilities were turned over to the State of New York in 1969.

26.    In 1970, the military section of the property was temporarily deactivated.

27.    In the 1970s, the civilian section of Stewart was operating as an airport.

28.    In 1983, the military section of Stewart reopened with the establishment of the

29.    105th Air Lift Wing of the New York Air National Guard.

30.    In 2007, the Port Authority  of New York and New Jersey purchased the remaining 93 years of the lease from National Express Group and took over possession, control and operation of the Stewart International Airport.

31.    Upon information and belief, AFFF has been used at the Stewart Air National Guard Base and Stewart International Airport since approximately 1970, which contains both PFOS and PFOA.

32.    At Stewart Air National Guard Base and Stewart International Airport, AFFF was used at crash sites and at the Airport Fire Training Areas, among other locations, in addition to leaking tanks, leading to the eventual release of AFFF into the groundwater and drinking water supply of the Plaintiffs and the City.

33.    On April 30, 1990, a spill of approximately 4,000 gallons of Ansul Ansulite 3% AFFF entered the storm drain which enters Silver Steam, contributing to the contamination of Plaintiffs' drinking water supply.

34.    On September 5, 1996, a Douglas DC-10-lOCF, operated by Federal Express Corporation as flight 1406 made an emergency landing at Stewart International Airport due to fire in the cabin.

35.    After landing, the airplane was destroyed by fire and AFFF was used to extinguish the flames.

36.    AFFF was used extensively at the Stewart Air National Guard Base and Stewart International Airport site for training purposes.

37.    Upon information and belief, AFFF was also discharged from the Stewart Air National Guard Base and Stewart International Airport Site in various ways, including but not limited to undocumented spills, leaks, tanks, storage facilities, and fire training exercises.

38.    The AFFF discharged, intentionally, negligently, or otherwise, was allowed to be discharged to the surrounding properties and into the soil, surface waters, groundwater, and eventually into the drinking water supply of the Plaintiffs.

39.    The AFFF used was never treated, captured, or otherwise contained   any manner to prevent or mitigate the eventual contamination of Plaintiffs' water supply.

40.     The AFFF discharged to the surrounding drainage basins and eventually into Washington Lake.

### D. Plaintiffs' Exposure and Damages

41.     Plaintiffs have suffered real personal injuries, bioaccumulation of PFOS/A in their bodies, property damage, and the diminution in value of their properties as a result of the PFOA and PFOS contamination of their water supply by AFFF releases.

42.     Plaintiffs have suffered from an assortment of diseases and medical conditions as a direct result of their exposure to PFOS/A contamination of the City of Newburgh's drinking water supply.

43.     The Plaintiffs, as residents and those who visited, worked, went to school, or otherwise drank water in the City of Newburgh area, have been unknowingly exposed for many years to PFCs including at concentrations hazardous to their health.

44.     Plaintiffs' unwitting exposure to PFOS/A in the City of Newburgh drinking water supply as a result of the Defendants' conduct is the direct and proximate cause of Plaintiffs' injuries.

45.     The properties of Plaintiffs have been damaged as a result of the presence of PFCs in their potable water.

46.      Plaintiffs seek recovery from Defendants for injuries, damages and losses suffered by Plaintiffs as a result of exposure to the introduction of PFOS, PFOA and other toxic substances into the drinking water of the City of Newburgh area and then into their properties and bodies, in an amount to be determined at trial, exclusive of interest, costs, and attorneys' fees.

## II. JURISDICTION AND VENUE

47.     This Court has personal jurisdiction over Defendant, The Port Authority of New York and New Jersey, pursuant to Title 17 of the Unconsolidated Laws of New York, § 7106, due to the residence of Defendant in Orange County.

48.     This case is properly venued in this Court pursuant to CPLR 503(a), because Plaintiffs reside in Orange County.

49.     This case is properly venued in this Court because Defendant Port Authority of New York and New Jersey operated Stewart International Airport at the time of the discharge and/or disposal and/or release of hazardous and toxic substances and/or violation of the State Pollutant Discharge Elimination System ("SPDES") permits, pursuant to Title 17 of the Unconsolidated Laws of the State of New York, §7106.

50.     Upon information and belief, this Court has personal jurisdiction over the Manufacturing Defendants as each of them is doing business in New York by manufacturing, distributing, producing and marketing products, services and/or materials in this State and/or to this State.

51.     At all relevant times to the Complaint, Defendants conducted substantial business in New York and availed themselves to the legal rights in New York thereby.

52.     Upon information and belief, Defendants maintain websites accessible to New York residents.

53.     Defendants have systematic and continuous commercial contacts with New York to establish jurisdiction over them pursuant to CPLR 302.

54.    This Court has personal jurisdiction over the defendants as each of them are doing business in New York and engage in business in New York such that it is reasonably foreseeable that they would be subject to jurisdiction of the courts of this State.

55.    This case is properly venued in this Court because the actions of the Defendants and the injuries and damages alleged herein all occurred in the County of Orange, New York.

### III. Parties

**A.    Plaintiffs Individual Claims**

56.    Plaintiff Elvia Y. Collart is a resident of the City of Newburgh, County of Orange and State of New York. Plaintiff Elvia Y. Collart currently resides at 167 S William St., Apt. 2, Newburgh, NY 12550. The property receives its water from the City of Newburgh, which drew its water from Washington Lake.

57.    Elvia Y. Collart has been exposed to PFOS/A and has elevated levels of PFOS/A in her blood. Mrs. Collart received her PFOS/A blood test results on April 24, 2019, and her levels were 8.41 ug/L and 1.23 ug/L respectively.

58.    Elvia Y. Collart has suffered from thyroid disease, headaches, dizziness, migraines, high blood pressure, and high cholesterol, as a direct result of exposure to PFOS/A and is at an increased risk of several health effects, including but not limited to effects on the liver and immune system, high cholesterol, thyroid disease, kidney cancer, testicular cancer, and other autoimmune diseases.

59.    While living at 167 S William St., Apt. 2, PFOS/A entered Elvia Y. Collart's property, including but not limited to the accumulation of PFOS/A in the pipes, faucet, showerheads, and appliances.

60.     On May 28, 2019, Elvia Y. Collart filed a Notice of Claim against Defendant Port Authority of New York and New Jersey pursuant to Title 17 of the Unconsolidated Laws of the State of New York, §§7107, 7108 for the injuries alleged herein.

61.     Plaintiff Diane M. Delfini is a resident of the City of Newburgh, County of Orange and State of New York. Plaintiff Diane M. Delfini currently resides at 2 Lutheran St., Apt. 3, Newburgh, NY 12550. The property receives its water from the City of Newburgh, which drew its water from Washington Lake.

62.     Diane M. Delfini has been exposed to PFOS/A and has elevated levels of PFOS/A in her blood. Mrs. Delfini received her PFOS/A blood test results on April 17, 2019, and her levels were 81.2 ug/L and 9.30 ug/L respectively.

63.     Diane M. Delfini has suffered from thyroid disease, kidney damage, liver problems, chronic bronchitis, cysts, fatigue, high cholesterol, pain, respiratory problems, vision loss, as a direct result of exposure to PFOS/A and is at an increased risk of several health effects, including but not limited to effects on the liver and immune system, high cholesterol, thyroid disease, kidney cancer, testicular cancer, and other autoimmune diseases.

64.     While living at 2 Lutheran, St., Apt. 3, PFOS/A entered Diane M. Delfini's property, including but not limited to the accumulation of PFOS/A in the pipes, faucet, showerheads, and appliances.

65.     On July 23, 2019, Diane M. Delfini filed a Notice of Claim against Defendant Port Authority of New York and New Jersey pursuant to Title 17 of the Unconsolidated Laws of the State of New York, §§7107, 7108 for the injuries alleged herein.

66.     Plaintiff Curlie W. Dillard is a resident of the City of Newburgh, County of Orange and State of New York. Plaintiff Curlie W. Dillard currently resides at 350 N Water St., Apt. 6-9,

Newburgh, NY 12550. The property receives its water from the City of Newburgh, which drew its water from Washington Lake.

67.     Curlie W. Dillard has been exposed to PFOS/A and has elevated levels of PFOS/A in his blood. Mr. Dillard received his PFOS/A blood test results on July 25, 2019, and his levels were 22.1 ug/L and 2.62 ug/L respectively.

68.     Curlie W. Dillard has suffered from prostate cancer, ulcerative colitis, kidney and bladder problems, kidney disease, cardiac problems, diabetes, high blood pressure, high cholesterol, respiratory problems, as a direct result of exposure to PFOS/A and is at an increased risk of several health effects, including but not limited to effects on the liver and immune system, high cholesterol, thyroid disease, kidney cancer, testicular cancer, and other autoimmune diseases.

69.     While living at 350 N. Water St., Apt. 6-9, PFOS/A entered Curlie W. Dillard's property, including but not limited to the accumulation of PFOS/A in the pipes, faucet, showerheads, and appliances.

70.     On May 28, 2019, Curlie W. Dillard filed a Notice of Claim against Defendant Port Authority of New York and New Jersey pursuant to Title 17 of the Unconsolidated Laws of the State of New York, §§7107, 7108 for the injuries alleged herein.

71.     Tiana Edwards and her minor child, Plaintiff C.E., are residents of the City of Newburgh, County of Orange and State of New York, and reside at 6 Liberty St., Apt. 2, Newburgh, New York 12550. The property receives its water from the City of Newburgh, which drew its water from Washington Lake.

72.     C.E. has been exposed to PFOS/A and has elevated levels of PFOS/A in his blood.

73.     As a direct result of exposure to PFOS/A, C.E. has suffered from headaches, dizziness, migraines and is at an increased risk of several health effects, including but not limited

to effects on the liver and immune system, high cholesterol, thyroid disease, testicular cancer, kidney cancer, and other autoimmune diseases.

74.    While living at 6 Liberty St., Apt. 2, PFOS/A entered Tiana Edward's property, including but not limited to the accumulation of PFOS/A in the pipes, faucet, showerheads, and appliances.

75.    On July 23, 2019, Tiana Edwards filed Notice of Claim on behalf of C.E. against Defendant Port Authority of New York and New Jersey pursuant to Title 17 of the Unconsolidated Laws of the State of New York, §§7107, 7108 on behalf of her children for the injuries alleged herein.

76.    Plaintiff Marc Jones is a resident of the City of Newburgh, County of Orange and State of New York. Plaintiff Marc Jones currently resides at 2 Chadwick Gardens, Apt. 27, Newburgh, NY 12550. The property receives its water from the City of Newburgh, which drew its water from Washington Lake.

77.    Marc Jones has been exposed to PFOS/A and has elevated levels of PFOS/A in his blood.

78.    Marc Jones has suffered from thyroid disease, erectile dysfunction, hair loss, high blood pressure, as a direct result of exposure to PFOS/A and is at an increased risk of several health effects, including but not limited to effects on the liver and immune system, high cholesterol, thyroid disease, kidney cancer, testicular cancer, and other autoimmune diseases.

79.    While living at 2 Chadwick Gardens, Apt. 27, PFOS/A entered Marc Jones' property, including but not limited to the accumulation of PFOS/A  in the pipes, faucet, showerheads, and appliances.

80.     On July 23, 2019, Marc Jones filed a Notice of Claim against Defendant Port Authority of New York and New Jersey pursuant to Title 17 of the Unconsolidated Laws of the State of New York, §§7107, 7108 for the injuries alleged herein.

81.     Plaintiff Angel Majano is a resident of the City of Newburgh, County of Orange and State of New York. Plaintiff Angel Majano currently resides at 167 S William St., Apt. 2, Newburgh, NY 12550. The property receives its water from the City of Newburgh, which drew its water from Washington Lake.

82.     Angel Majano has been exposed to PFOS/A and has elevated levels of PFOS/A in his blood.

83.     Angel Majano has suffered from thyroid disease, headaches, dizziness, migraines, heartburn, high blood pressure, high cholesterol, as a direct result of exposure to PFOS/A and is at an increased risk of several health effects, including but not limited to effects on the liver and immune system, high cholesterol, thyroid disease, kidney cancer, testicular cancer, and other autoimmune diseases.

84.     While living at 167 S William St., Apt. 2, PFOS/A entered Angel Majano's property, including but not limited to the accumulation of PFOS/A  in the pipes, faucet, showerheads, and appliances.

85.     On May 28, 2019, Angel Majano filed a Notice of Claim against Defendant Port Authority of New York and New Jersey pursuant to Title 17 of the Unconsolidated Laws of the State of New York, §§7107, 7108 for the injuries alleged herein.

86.     Rigoberto Majano and his minor child, Plaintiff A.M., are residents of the City of Newburgh, County of Orange and State of New York, and reside at 167 S William St. Apt. 2,

Newburgh, New York 12550. The property receives its water from the City of Newburgh, which drew its water from Washington Lake.

87.     A.M. has been exposed to PFOS/A and has elevated levels of PFOS/A in her blood. A.M. received her PFOS/A blood test results on April 24, 2019 and her levels were 9.97 ug/L and 1.92 ug/L respectively.

88.     As a direct result of exposure to PFOS/A, A.M. has suffered from thyroid disease, headaches, dizziness, migraines, high blood pressure, high Cholesterol, including but not limited to effects on the liver and immune system, high cholesterol, thyroid disease, testicular cancer, kidney cancer, and other autoimmune diseases.

89.     While living at 167 S William St., Apt. 2, PFOS/A entered Rigoberto Majano's property, including but not limited to the accumulation of PFOS/A in the pipes, faucet, showerheads, and appliances.

90.     On May 28, 2019 Rigoberto Majano filed a Notice of Claim on behalf of A.M. against Defendant Port Authority of New York and New Jersey pursuant to Title 17 of the Unconsolidated Laws of the State

B.     Defendants

     i. The AFFF Defendants

91.     The term "AFFF Defendants" refers collectively to Defendants 3M Company, Amerex Corporation, Buckeye Fire Equipment Company, Carrier Global Corporation, Chemguard Inc., Kidde-Fenwal, Inc., and Tyco Fire Products L.P.

92.     Defendant The 3M Company f/k/a Minnesota Mining and Manufacturing Co. ("3M") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 3M Center, St. Paul, Minnesota 55144-1000.

93. Beginning before 1970 and until at least 2002, 3M designed, manufactured, marketed, distributed, and sold AFFF containing PFAS, including but not limited to PFOA and PFOS.

94. Defendant Amerex Corporation ("Amerex") is a corporation organized and existing under the laws of the State of Alabama, with its principal place of business located at 7595 Gadsden Highway, Trussville, AL 35173.

95. Amerex is a manufacturer of firefighting products. Beginning in 1971, it was a manufacturer of hand portable and wheeled extinguishers for commercial and industrial applications.

96. In 2011, Amerex acquired Solberg Scandinavian AS, one of the largest manufacturers of AFFF products in Europe.

97. On information and belief, beginning in 2011, Amerex designed, manufactured, marketed distributed, and sold AFFF containing PFAS, including but not limited to PFOA and PFOS.

98. Defendant Tyco Fire Products LP ("Tyco") is a limited partnership organized under the laws of the State of Delaware, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143-2542.

99. Tyco is the successor in interest of The Ansul Company ("Ansul"), having acquired Ansul in 1990.

100. Beginning in or around 1975, Ansul designed, manufactured, marketed, distributed, and sold AFFF containing PFAS, including but not limited to PFOA and PFOS.

101.    After Tyco acquired Ansul in 1990, Tyco/Ansul continued to design, manufacture, market, distribute, and sell AFFF products containing PFAS, including but not limited to PFOA and PFOS.

102.    Defendant Chemguard, Inc. ("Chemguard") is a corporation organized under the laws of the State of Texas, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143.

103.    On information and belief, Chemguard designed, manufactured, marketed, distributed, and sold AFFF products containing PFAS, including but not limited to PFOA and PFOS.

104.    On information and belief, Chemguard was acquired by Tyco International Ltd. in 2011.

105.    Defendant Buckeye Fire Equipment Company ("Buckeye") is a corporation organized under the laws of the State of Ohio, with its principal place of business located at 110 Kings Road, Kings Mountain, North Carolina 28086.

106.    On information and belief, Buckeye designed, manufactured, marketed, distributed, and sold AFFF products containing PFAS, including but not limited to PFOA and PFOS.

107.    Defendant Kidde-Fenwal, Inc. ("Kidde-Fenwal") is a corporation organized under the laws of the State of Delaware, with its principal place of business at One Financial Plaza, Hartford, Connecticut 06101.

108.    Beginning in or around 1973, National Foam designed, manufactured, marketed, distributed, and sold AFFF containing PFAS, including but not limited to PFOA and PFOS.

109.    On information and belief, National Foam merged with Chubb Fire Ltd. to form Chubb National Foam, Inc. in or around 1988.

110.  On information and belief, Chubb is or has been composed of different subsidiaries and/or divisions, including but not limited to, Chubb Fire & Security Ltd., Chubb Security, PLC, Red Hawk Fire & Security, LLC, and/or Chubb National Foam, Inc. (collectively referred to as "Chubb").

111.  On information and belief, Chubb was acquired by Williams Holdings in 1997.

112.  On information and belief, Angus Fire Armour Corporation had previously been acquired by Williams Holdings in 1994.

113.  On information and belief, Williams Holdings was demerged into Chubb and Kidde P.L.C. in or around 2000.

114.  On information and belief, when Williams Holdings was demerged, Kidde P.L.C. became the successor in interest to National Foam System, Inc. and Angus Fire Armour Corporation.

115.  On information and belief, Kidde P.L.C. was acquired by United Technologies Corporation in or around 2005.

116.  On information and belief, Kidde-Fenwal was an operating subsidiary of Kidde P.L.C. and manufactured AFFF following Kidde P.L.C.'s acquisition by United Technologies Corporation.

117.  On information and belief, the Angus Fire and National Foam businesses separated from United Technologies Corporation in or around June 2013.

118.  On information and belief, Kidde-Fenwal is the entity that in June 2013 divested the AFFF business unit now operated by National Foam.

119.    Defendant Carrier Global Corporation ("Carrier") is a corporation organized under the laws of the State of Delaware, with its principal place of business at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418.

120.    On information and belief, Carrier was formed in March 2020 when United Technologies Corporation spun off its fire and security business prior to merging with Raytheon Company a month later. On information and belief, Carrier became successor in interest to Kidde-Fenwal as part of the spin off and is legally responsible for the liabilities arising from Kidde-Fenwal's design, manufacture, marketing, distribution, and sale of AFFF.

121.    On information and belief, the AFFF Defendants designed, manufactured, marketed, distributed, and sold AFFF products containing PFOS, PFOA, and/or their chemical precursors that were stored, handled, used, trained with, tested equipment with, otherwise discharged, and/or disposed at Stewart Air National Guard Base and Stewart International Airport.

ii.    The Fluorosurfactant Defendants

122.    The term "Fluorosurfactant Defendants" refers collectively to Defendants 3M, Arkema Inc., ChemDesign Products Incorporated, Chemguard Inc., Deepwater Chemicals, Inc., E.I. DuPont de Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, DuPont de Nemours Inc., and Dynax Corporation.

123.    Defendant Arkema Inc. ("Arkema") is a corporation organized and existing under the laws of Pennsylvania, with its principal place of business at 900 First Avenue, King of Prussia, PA 19406.

124.    On information and belief, beginning sometime in the early 1970s, the French chemical company Atochem designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

Case 1:22-cv-04234-PAE   Document 1-1   Filed 05/23/22   Page 25 of 67

125.    On information and belief, when Atochem's parent company, Elf-Acquitaine, merged with TotalFina in 1999 to form TotalFinaElf, the two companies combined their chemical operations to create Atofina S.A. ("Atofina"). On information and belief, Atofina continued to design, manufacture, market, distribute, and sell fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

126.    On information and belief, Atofina sold its fluorosurfactant business to Dupont Chemical Solutions Enterprise in September 2002.

127.    On information and belief, Arkema was created in October 2004 when TotalFinaElf spun off Atofina. On information and belief, Arkema is the successor in interest to Atofina and is legally responsible for the liabilities arising from the manufacture of fluorosurfactants used in AFFF by Atofina and its predecessors before September 2002.

128.    Defendant ChemDesign Products Inc. ("ChemDesign") is a corporation organized under the laws of Delaware, with its principal place of business located at 2 Stanton Street, Marinette, WI, 54143.

129.    On information and belief, ChemDesign designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

130.    Defendant Deepwater Chemicals, Inc. ("Deepwater") is a corporation organized under the laws of Delaware, with its principal place of business located at 196122 E County Road 40, Woodward, OK, 73801.

131.    On information and belief, Deepwater Chemicals designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

132.     Defendant Dynax Corporation ("Dynax") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 103 Fairview Park Drive, Elmsford, New York 10523.

133.     On information and belief, Dynax entered into the AFFF market on or about 1991 and quickly became a leading global producer of fluorosurfactants and fluorochemical stabilizers containing PFOS, PFOA, and/or their chemical precursors.

134.     On information and belief, Dynax designed, manufactured, marketed, distributed, and sold fluorosurfactants and fluorochemical stabilizers containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

135.     Defendant E.I. du Pont de Nemours & Company ("DuPont") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.

136.     Defendant The Chemours Company ("Chemours Co.") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, P.O. Box 2047, Wilmington, Delaware, 19899.

137.     In 2015, DuPont spun off its performance chemicals business to Chemours Co., along with vast environmental liabilities which Chemours Co. assumed, including those related to PFOS and PFOA and fluorosurfactants. On information and belief, Chemours Co. has supplied fluorosurfactants containing PFOS and PFOA, and/or their chemical precursors to manufacturers of AFFF products.

138.     On information and belief, Chemours Co. was incorporated as a subsidiary of DuPont as of April 30, 2015. From that time until July 2015, Chemours Co. was a wholly-owned subsidiary of DuPont.

139.     In July 2015, DuPont spun off Chemours Co. and transferred to Chemours Co. its "performance chemicals" business line, which includes its fluoroproducts business, distributing shares of Chemours Co. stock to DuPont stockholders, and Chemours Co. has since been an independent, publicly-traded company.

140.     Defendant The Chemours Company FC, LLC ("Chemours FC") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, Wilmington, Delaware, 19899.

141.     Defendant Corteva, Inc. ("Corteva") is a corporation organized and existing under the laws of Delaware, with its principal place of business at 974 Centre Rd., Wilmington, Delaware 19805.

142.     Defendant Dupont de Nemours Inc. f/k/a DowDuPont, Inc. ("Dupont de Nemours Inc.") is a corporation organized and existing under the laws of Delaware, with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805 and 2211 H.H. Dow Way, Midland, Michigan 48674.

143.     On June 1, 2019, DowDuPont separated its agriculture business through the spin-off of Corteva.

144.     Corteva was initially formed in February 2018. From that time until June 1, 2019, Corteva was a wholly-owned subsidiary of DowDuPont.

145.     On June 1, 2019, DowDuPont distributed to DowDuPont stockholders all issued and outstanding shares of Corteva common stock by way of a pro-rata dividend. Following that distribution, Corteva became the direct parent of E. I. Du Pont de Nemours & Co.

146.     Corteva holds certain DowDuPont assets and liabilities, including DowDuPont's agriculture and nutritional businesses.

147.    On June 1, 2019, DowDuPont, the surviving entity after the spin-off of Corteva and of another entity known as Dow, Inc., changed its name to DuPont de Nemours, Inc., to be known as DuPont ("New DuPont"). New DuPont retained assets in the specialty products business lines following the above-described spin-offs, as well as the balance of the financial assets and liabilities of E.I DuPont not assumed by Corteva.

148.    Defendants E. I. Du Pont de Nemours and Company; The Chemours Company; The Chemours Company FC, LLC; Corteva, Inc.; and DuPont de Nemours, Inc. are collectively referred to as "DuPont" throughout this Complaint.

149.    On information and belief, DuPont designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

150.    On information and belief, 3M and Chemguard also designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

151.    On information and belief, the Fluorosurfactant Defendants designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products that were stored, handled, used, trained with, tested equipment with, otherwise discharged, and/or disposed at Stewart Air National Guard Base and Stewart International Airport.

iii.    The PFC Defendants

152.    The term "PFC Defendants" refers collectively to 3M, AGC Chemicals Americas Inc., Archroma U.S., Inc., ChemDesign Products Inc., Chemicals, Inc., Clariant Corporation, Deepwater Chemicals, Inc., E. I. DuPont de Nemours and Company, The Chemours Company,

The Chemours Company FC, LLC, Corteva, Inc., DuPont de Nemours Inc., and Nation Ford Chemical Company.

153.    Defendant AGC Chemicals Americas, Inc. ("AGC") is a corporation organized and existing under the laws of Delaware, having its principal place of business at 55 East Uwchlan Avenue, Suite 201, Exton, PA 19341.

154.    On information and belief, AGC Chemicals Americas, Inc. was formed in 2004 and is a subsidiary of AGC Inc., a foreign corporation organized under the laws of Japan, with its a principal place of business in Tokyo, Japan.

155.    AGC manufactures specialty chemicals. It offers glass, electronic displays, and chemical products, including resins, water and oil repellants, greenhouse films, silica additives, and various fluorointermediates.

156.    On information and belief, AGC designed, manufactured, marketed, distributed, and sold PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

157.    Defendant Clariant Corporation ("Clariant") is a corporation organized and existing under the laws of New York, with its principal place of business at 4000 Monroe Road, Charlotte, North Carolina 28205.

158.    On information and belief, Clariant is the successor in interest to the specialty chemicals business of Sandoz Chemical Corporation ("Sandoz"). On information and belief, Sandoz spun off its specialty chemicals business to form Clariant in 1995.

159.    On information and belief, Clariant designed, manufactured, marketed, distributed, and sold PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

160.    Defendant Archroma U.S., Inc. ("Archroma") is a corporation organized and existing under the laws of Delaware, with its a principal place of business at 5435 77 Center Drive, Charlotte, North Carolina 28217.

161.    On information and belief, Archroma was formed in 2013 when Clariant Corporation divested its textile chemicals, paper specialties, and emulsions business to SK Capital Partners.

162.    On information and belief, Archroma designed, manufactured, marketed, distributed, and sold PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

163.    Defendant Chemicals, Inc. ("Chemicals, Inc.") is a corporation organized and existing under the laws of Texas, with its principal place of business located at 12321 Hatcherville, Baytown, TX 77520.

164.    On information and belief, Chemicals, Inc. supplied PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

165.    Defendant Nation Ford Chemical Co. ("Nation Ford") is a corporation organized and existing under the laws of South Carolina, with its principal place of business located at 2300 Banks Street, Fort Mill, SC 29715.

166.    On information and belief, Nation Ford supplied PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

167.    On information and belief, 3M, ChemDesign, Deepwater Chemicals, and DuPont also supplied PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

168.    On information and belief, the Fluorochemical Defendants supplied PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products that were stored, handled, used, trained with, tested equipment with, otherwise discharged, and/or disposed at Stewart Air National Guard Base and Stewart International Airport .

169.    Defendants represent all or substantially all of the market for AFFF/Component Products at Stewart Air National Guard Base and Stewart International Airport.

170.    Plaintiffs have filed Notices of Claim against Defendant Port Authority of New York and New Jersey pursuant to Title 17 of the Unconsolidated Laws of the State of New York, §§ 7107, 7108.

171.    Plaintiffs' claims against Defendants arose at the absolute earliest, on or about August 12, 2016 when the New York State Department of Environmental Conservation ("DEC") declared the Stewart Air National Guard Base a State Superfund Site.

172.    Plaintiffs' claims continue to arise as injuries are diagnosed and blood testing is taken and the results are received by the New York State Department of Health.

173.    Through the State Superfund designation, DEC announced that PFCs were detected in public and private supply wells of Newburgh, NY, in the vicinity of Stewart Air National Guard Base and Stewart International Airport at levels dangerous to the people's health.

174.    Plaintiffs have complied with all procedural requirements under Title 17 of the Unconsolidated Laws of the State of New York, §§ 7107, 7108, before bringing the instant actions.

## FACTUAL ALLEGATIONS AS TO ALL COUNTS

175.    Perfluorooctanoic acid (PFOA, also known as C8 or perfluorooctanoate) is a man-made, manufactured chemical not found in nature that belongs to a group of fluorine-containing chemicals called perfluorinated chemicals (PFC's). These chemicals were and are used to make household and commercial products that resist heat and chemical reactions, and repel oil, stains, grease, and water as well as other uses.

176.    In 1947, 3M began producing PFOA via electrochemical fluorination.

177.    Over the years, a number of companies, including but not limited to, Arkema, Asahi, BASF, Clariant, Daikin, DuPont, and Solvay Selexis have manufactured PFOA within the United States.

178.    PFOA is a fluorine-containing chemical that is primarily used in the production of fluoropolymers such as poly-tetra-fluoro-ethylene ("PTFE").

179.    PFOA and PFOS are readily absorbed after consumption or inhalation, and accumulate primarily in the blood stream, kidney and liver.

180.    In 2006, eight major PFOA manufacturers agreed to participate in the U.S. Environmental Protection Agency's ("EPA") PFOA Stewardship Program. The participating companies made voluntary commitments to reduce product content and facility emissions of PFOA and related chemicals by 95%, no later than 2010.

181.    In the May 2015 "Madrid Statement on Poly- and Perfluoroalkyl Substances (PFASs)1," scientists and other professionals from a variety of disciplines, concerned about the production and release into the environment of PFOA's, called for greater regulation, restrictions,

---

[1] Blum A, Balan SA, Scheringer M, Trier X, Goldenman G, Cousins IT, Diamond M, Fletcher T, Higgins C, Lindeman AE, Peaslee G, de Voogt P, Wang Z, Weber R. 2015. The Madrid statement on poly- and perfluoroalkyl substances (PFASs). Environ Health Perspect 123:A107–A111; http://dx.doi.org/10.1289/ehp.1509934

Case 1:22-cv-04234-PAE   Document 1-1   Filed 05/23/22   Page 33 of 67

limits on the manufacture and handling of any PFOA containing product, and to develop safe non-fluorinated alternatives to these products to avoid long-term harm to human health and the environment.

182.    As of May 2016, the EPA issued Lifetime Health Advisories and Health Effects Support Documents for PFOA and PFOS2. The EPA identifies the concentration of PFOA or PFOS in drinking water at or below which health effects are not anticipated to occur over a lifetime of exposure at 70 parts per trillion (ppt). While health advisories are non-regulatory, they reflect the EPA's assessment of the best available peer-reviewed science.

183.    The State of New York listed PFOS and PFOA as a hazardous substance on March 3, 2017.

184.    PFOS and PFOA get into the environment from industrial facilities that make PFOS or use PFOA to make other products. It also enters the environment when released from PFOA-containing consumer and commercial products during their use and disposal.

185.    PFOS and PFOA can remain in the environment, particularly in water, for many years and can move through soil and into groundwater or be carried in air.

186.    Human studies show associations between increased PFOA and PFOS levels in blood and an increased risk of several health effects, including high cholesterol levels, changes in thyroid hormone, ulcerative colitis (autoimmune disease), pre-eclampsia (a complication of pregnancy that includes high blood pressure), and kidney and testicular cancer.

187.    These injuries can arise months or years after exposure to PFOS and PFOA.

188.    PFOS's extreme persistence in the environment and its toxicity, mobility and bioaccumulation potential, pose potential adverse effects to human health and the environment.

---

[2] Lifetime Health Advisories and Health Effects Support Documents for Perfluorooctanoic Acid and Perfluorooctane Sulfonate, 81 Fed. Reg. 101 (May 25, 2016).

## A. AFFF Background

189.     Aqueous film forming foam (AFFF) is Class-B firefighting foam. It is water based and used to extinguish fires that are difficult to fight, particularly those that involve petroleum or other flammable liquids.

190.     AFFF was introduced commercially in the mid-1960s and rapidly became the primary firefighting foam in the U.S. and many parts of the world. AFFF provided better performance over normal Protein foam, which had been in wide spread use since World War II.

191.     AFFF's are synthetically formed by combining fluorine free hydrocarbon foaming agents with highly fluorinated surfactants. When mixed with water, the resulting solution has the characteristics needed to produce an aqueous film that spreads across the surface of a hydrocarbon fuel. It is this film formation feature that provides fire extinguishment and is the source of the designation, aqueous film forming foam.

192.     The United States Air Force ("USAF") began using PFC-based AFFF in 1970 to extinguish fuel-based fires.

193.     The USAF was never warned of the toxic properties of Defendants' AFFF or the biological and environmental persistence of the PFCs in their AFFF.

194.     Beginning in 2009, the USAF followed the EPA issued short-term provisional health advisory of 400 ppt for PFA and 200 ppt of PFOS. The USAF now applies the current EPA lifetime exposure health advisory of 70 ppt for both PFOA and PFOS.[3]

195.     Fluorosurfactants used in 3M's AFFF were produced by a unique process known as electrochemical fluorination (ECF). The ECF process results in a product that contains and/or breaks down into compounds containing PFOS and/or PFOA.

---

[3] *Air Force applies new EPA guidance*, Air Force Civil Engineer Center Public Affairs, May 19, 2016.

196.    In the foam industry, concentrates are typically referred to as "3%" or "6%" concentrate, depending on the mixture rate with water. AFFF concentrates contain about 60-90% water and have a fluorine content of about 0.3-1.8%.

## B. Defendants' Knowledge of the Threats to Public Health and the Environment Posed by PFCs

197.    On information and belief, by at least the 1970s 3M knew or should have known that PFOA and PFOS are mobile and persistent, bioaccumulative and biomagnifying, and toxic.

198.    Upon information and belief, 3M concealed from the public and government agencies its knowledge of the risk of harm posed by PFCs.

199.    In 1975, 3M concluded that PFOS was present in the blood of the general population. Since PFOA and PFOS are not naturally occurring, this finding should have alerted 3M to the possibility that their products were a source of this PFOS. The finding also should have alerted 3M to the possibility that PFOS might be mobile, persistent, bioaccumulative, and biomagnifying, as those characteristics could explain the absorption of PFOS in blood from 3M's products.

200.    In 1976, 3M found PFOA in the blood of its workers. This finding should have alerted 3M to the same issues raised by the findings regarding PFOS in the prior year.

201.    A 1978 study by 3M showed that PFOA reduced the survival rate of fathead minnow fish eggs.

202.    Other studies by 3M in 1978 showed that PFOS and PFOA are toxic to rats, and that PFOS is toxic to monkeys. In one study in 1978, all monkeys died within the first few days of being given food contaminated with PFOS.

203.    Studies by 3M after the 1970s also showed adverse effects from exposure to PFOA and PFOS.

204. In a 1983 study, for example, 3M found that PFOS caused the growth of cancerous tumors in rats.

205. A study proposal by 3M in 1983 stated that the resistance to degradation of PFOA and PFOS made them "potential candidates for environmental regulations, including further testing requirements under laws such as the Toxic Substances Control Act." 3M Environmental Laboratory (EE & PC), Fate of Fluorochemicals - Phase II, at p.6 (E. A. Reiner, ed. May 20, 1983).

206. A 1997 material safety data sheet ("MSDS") for a non-AFFF product made by 3M listed its only ingredients as water, PFOA, and other per-fluoroalkyl substances and warned that the product includes "a chemical which can cause cancer." The MSDS cited "1983 and 1993 studies conducted jointly by 3M and DuPont" as support for this statement. On information and belief, 3M's MSDSs for AFFF did not provide similar warnings.

207. Federal law requires chemical manufacturers and distributors to immediately notify the United States Environmental Protection Agency ("EPA") if they have information that "reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment." Toxic Substances Control Act ("TSCA") § 8(e), 15 U.S.C. § 2607(e).

208. 3M did not comply with its duty under TSCA, and in April 2006 it agreed to pay EPA a penalty of more than $1.5 million for its failure to disclose studies regarding PFOA or PFOS and other per-fluoroalkyl substances dating back decades, among other things.

209. On information and belief, all defendants knew or should have known that in its intended and/or common use, AFFF containing PFOA or PFOS would very likely injure and/or threaten public health and the environment. On information and belief, this knowledge was accessible to all defendants. For example, in 1970 a well-established firefighting trade association

was alerted to the toxic effects on fish of a chemical compound related to PFOS. On information and belief, at least the following defendants are and/or were members of this trade association: 3M, Tyco/Ansul, Chemguard, and National Foam/Angus.

210.    Additionally, on information and belief, all defendants knew or should have known that their AFFF products and the PFOA and PFOS the products contained, easily dissolve in water, because the products were designed to be mixed with water; are mobile, because the products were designed to quickly form a thin film; resist degradation, because that is the nature of the products' chemical composition, and on information and belief the products had long shelf-lives; and tend to bioaccumulate, because studies regarding the presence of substances with carbon-fluorine bonds in the blood of the general population were publicly available beginning in at least 1976.

211.    The Defendants failed to warn and share information with all of its customers on the impacts of their products to the quality of unprotected water sources.

212.    The Defendants' products created major waste management problems which they absolved themselves of, providing their customers with no practical guidance and instructions on how to deal with.

213.    Some or all of the defendants understood how stable the fluorinated surfactants used in their AFFF formulations are when released into the environment from the first sale to their customers but neither warned customers nor provided reasonable instruction on how to manage wastes generated from use of their products. The persistence and contaminating nature of the perfluorinated surfactant 3M made that went into its AFFF products was well understood prior to the commercial applications of these surfactants at 3M's Cottage Grove facility in Minnesota.

214. The inventor of 3M's surfactants was J. H. Simons. Simons' 1948 patent (Simons[4]) reports: PFCs are "non-corrosive, and of little chemical reactivity"; "do not react with any of the metals at ordinary temperatures and react only with the more chemically reactive metals such as sodium, at elevated temperatures".

215. Simons reported that the surfactants that 3M specified for its AFFF do not react with other compounds or reagents due to the blanket of fluorine atoms surrounding the carbon skeleton of the molecule. These highly stable chemicals were developed to provide non-reactive solid and liquid chemicals with low surface tensions that could withstand high temperatures and would not react with highly reactive materials such as oxygen (see Simons[5], Bryce[6]). 3M understood that the stability of the carbon-to-fluorine bonds and the lack of attraction for other chemical species prevent these surfactants from undergoing further chemical reactions or degrading under natural processes in the environment (see Simons 1950 published work[7]).

216. Bryce, an employee of 3M, published an authoritative treatise stating "[t]his chemical stability also extends itself to all types of biological processes; there are no known biological organisms that are able to attack the carbon-fluorine bond in a fluorocarbon" (Bryce (1964)).

217. The thermal stability of 3M's surfactants was understood prior to commercial production. In 1947, two researchers reported that fluorocarbon compounds did not degrade at temperatures as high as 500° C (932°F), even in the presence of catalytic materials (Grosse, et

---

[4] Simons, J. H., U.S. Patent No. 2,447,717. August 24, 1948.
[5] Simons, J. H., 1949. Fluorocarbons. Scientific American, Inc., 181(5): 44-47.
[6] Bryce, H. G., 1964. Industrial and Utilitarian Aspects of Fluorine Chemistry. Fluorine Chemistry. 5(4): 295-498.

[7] Simons, J. H., 1950. Fluorocarbons and Their Production. Fluorine Chemistry, 1(12): 401-422.

al..8). Simons' patent application further discloses that the chemicals he invented were thermally

stable at temperatures up to 750° C (1382° F) (see Simons (1948); Simons et al., (1949)). These

chemicals are non-reactive and thermally stable due to the strength and stability of the carbon-to-

fluorine bonds (Simons (1949); Bryce (1950)[9]). Additional research by 3M expanded the

understanding of the thermal stability of perfluorocarbon compounds. Bryce explained that the

fracture of the carbon-to-carbon bonds may take place at very high temperatures from 600 to 1000°

C (1112 to 1832° F) depending on the carbon chain length. He also reported that the carbon-to-

fluorine bond is much stronger and can require temperatures of 1200° C (2192° F) to break (Bryce,

1964).

218.    Nowhere in any Material Safety Data Sheet for any of the defendants' products is

information on the thermal stability of their surfactants disclosed. Failure to disclose knowledge

of how stable the chemical ingredients in the AFFF product to customers is a failure to warn just

how indestructible the surfactant ingredients are when released to unprotected water sources and

even treatment plants. The remarkable thermal stability of the surfactants used in defendants'

formulations means that there is a risk that the customer has to deal with because the surfactant

ingredients are incredibly stable. The surfactant additive is so stable that it is indestructible under

normal use and environmental conditions; facts which are known by AFFF manufacturers and not

apparent to the users of these products.

219.    Defendant 3M was capable of producing a variety of perfluorinated products at its

Cottage Grove facility (PFOS, PFOA, and PFBA, in addition to the salts of PFOS, PFOA, and

---

[8] Grosse, A. V., et al., 1947. Properties of Fluorocarbons. Industrial and Engineering Chemistry, 39(3): 367-374. March.

[9] Bryce, T. J., 1950. Fluorocarbons - Their Properties and Wartime Development. Fluorine Chemistry, 1(13): 423-462.

PFBA). All of these surfactants were understood by 3M to readily dissolve in water. In 1962, testing of PFOS-based surfactants indicated that these compounds were very soluble (Guenthner, et al.10). Numerous PFCs manufactured by 3M, including fluorocarbon carboxylic acids and fluorocarbon sulfonic acids such as PFOA and PFOS readily dissolve when mixed with water (Bryce (1964)). 3M knew by 1964 that when dissolved, fluorocarbon carboxylic acids and fluorocarbon sulfonic acids dissociated to form highly stable perfluorocarboxylate and perfluorosulfonate ions (Bryce (1964)). Later studies by 3M on the adsorption and mobility of FC-95 and FC-143 (the ammonium salt of PFOA) in soils indicated very high solubility and very high mobility in soils for both compounds.11

220.    Defendant 3M understood from the earliest days it acquired the Simons' patents that the surfactants it commercialized had extremely limited reactivity and that the high thermal stability of the perfluorinated carbon chain inhibited degradation in the environment (Bryce, 1950). The breaking of a carbon-to-fluorine bond requires the input of large amounts of energy to overcome the chemical bond between carbon and fluorine. Chemical and physical processes occurring in nature lack sufficient energy to break carbon-to-fluorine bonds and without this input of energy, the carbon-to-fluorine bonds remain intact.

221.    Bryce wrote "This chemical stability also extends itself to all types of biological processes; there are no known biological organisms that are able to attack the carbon-fluorine bond in a fluorocarbon" (Bryce, 1964). 3M had understanding of the chemical stability of the carbon-to-fluorine bond. It knew that its surfactants were immune to chemical and biological degradation in soils and groundwater.

---

[10] Guenthner, R. A., et al., 1962. Surface Active Materials From Perfluorocarboxylic and Perfluorosulfonic Acids, 1(3): 165-168.

[11] 3M, 1978 [3MA10036129]

222.    A 1971 internal memo by H.G. Bryce states that "the thesis that there is 'no natural sink' for fluorocarbons obviously demands some attention." Hence, 3M understood at the very least that when its AFFF product ingredient was released to the environment it basically will never degrade[12].

223.    In natural environments, the surfactants do not undergo degradation of the carbon-to-fluorine bonds of the perfluorinated carbon chain. The non-fluorinated, functional group of the chemical will partially degrade, yielding recalcitrant products such as PFOS, PFOA, and PFBA, which then resist further degradation. Basic weathering and degradation reactions, such as hydrolysis, occur at the non-fluorinated, functional group end of the molecule, producing the original fluorocarbon compound (Pearlson[13]). Depending on the surfactant these reduce to PFOS, PFOA, or PFBA.

224.    Defendant 3M knew that the perfluorinated components in its AFFF product(s) when released to the environment would not degrade the perfluorinated carbon structure, but would remain intact and persist (Bryce, 1950). Nearly 30 years later and after the establishment of a robust market of AFFFs using such ingredients, defendant 3M finally got around to looking at the environmental risks its products pose. See a 1979 3M study[14] which reports on its surfactant FC95 citing multiple studies on toxicity and biodegradability. The study reports that "F-95 was found to be completely resistant to biological test conditions... it appears that waterways are the environmental sink for FC95..."

---

[12] 3M, 1971 [3MA02496587]
[13] Pearlson, W. H., 1950. Fluorocarbon Derivatives. Fluorine Chemistry, 1(14): 463-522.
[14] 3MA10066577

225.    A 1978 3M biodegradation study15 reports "… the results of the quite extensive study strongly suggests that FM3422 is likely to persist in the environment for extended period unaltered by metabolic attack."

226.    3M and other defendants chose not to disclose their knowledge of the inability of their surfactants to break down in the natural environment. They failed to warn that their products can contaminate drinking water sources for many decades despite their knowledge that this was a likely outcome from the use of their products.

227.    All of the defendants are sophisticated and knowledgeable in the art and science of formulating AFFF products. They understood far more about the properties of and the biodegradability of their additives than any other customer. They chose not to use their knowledge to design safer products. See Ansul16 which wrote the following about the biodegradation of AFFF: Biodegradation is a "measure of how completely a substance breaks down in the environment. The biodegradability of a chemical is expressed as a percentage determined by dividing the BOD by the COD and multiplying by 100. The chemical oxygen demand, COD, is the amount of oxygen needed to completely break a chemical down to its most oxidized state (for example: $CO_2$, $H_2O$, and HF) and is a measured analytical value. The biochemical oxygen demand, BOD, is an empirical test that measures a relative oxygen requirement. This test measures the oxygen required for the biochemical degradation of organic and inorganic material… For firefighting foams, this test is conducted for 20 days as opposed to the usual five days for other chemicals because the bacteria requires a longer time to acclimate to the test solution of the foam… B[b]iodegradation is the percentage ratio of BOD/COD. If that resulting number is higher than 50%, the chemical is determined to be readily biodegradable. If it is below 15%, the chemical is

---

[15] 3MA00717615
[16] Ansul Inc., Environmental Aspects of AFFF and AR-AFFF, White Paper 1017, 2003

determined to be not biodegradable. Ansul summarized its explanation by noting: If BOD/COD > 50%, then biodegradable; If BOD/COD < 15%, then NOT biodegradable.

228.     The information that Ansul published and widely distributes to its customers is both misleading and deceitful. Ansul's explanation ignores the fact that while the foam stabilizer additives biodegrade, perfluorinated surfactants do not. Dimitrov, et al.[17] report that PFAS when present in the environment does not undergo any further chemical, microbial or photolytic degradation or breakdown. Long before Dimitrov, 3M understood this as shown by its explanation of biodegradability in a 1976 study, noting that hydrocarbon components of a perfluorinated admixture will degrade leaving behind the perfluorinated components which do not biodegrade.[18] Once these substances undergo biotic or abiotic degradation, the perfluorinated moiety that remains will be PFOS. The rate of degradation to PFOS is not considered significant and over time these substances are all expected to degrade in the environment to environmentally persistent PFOS. These were facts that were known by 3M in the 1960s. These were facts that other AFFF manufacturers knew or should have known; and if they didn't then they simply created their products blindly and without concern as to whether they could cause harm to unprotected water resources and place communities at risk.

229.     Defendant 3M along with Ansul and likely others had intimate understanding of the poor biodegradation of their fluorochemical compounds. A 1976 study, for example, observed no biodegradation of FC-95, the potassium salt of PFOS. 3M characterized the result of the study "unsurprising" in light of the fact that "[b]iodegradation of FC 95 is improbable because it is completely fluorinated".19

---

[17] *Ibid*, Dimitrov, S., et al. 2004.

[18] 3MA01252037
[19] 3M, 1976 [3MA01252037]

230.     The Ansul Company (Tyco), published a report in 1977 titled Environmentally Improved AFFF.[20] This report acknowledges that AFFFs were understood to be environmentally damaging and could pose potential negative impacts to groundwater quality. Ansul wrote: "The purpose of this work is to explore the development of experimental AFFF formulations that would exhibit reduced impact on the environment while retaining certain fire suppression characteristic...improvements [to AFFF formulations] are desired in the environmental area, i.e., development of compositions that have a reduced impact on the environment without loss of fire suppression effectiveness." Its study showed it had the ability to reformulate its AFFF products to be biodegradable, but there is no evidence that any company bothered to do so.

231.     Also, in 1979 Defendant 3M carried out a comprehensive biodegradation and toxicity study covering investigations between 1975 and 1978.[21] More than 10 years after 3M began selling its AFFF products it wrote "there has been a general lack of knowledge relative to the environmental impact of these chemicals." This report ominously discloses "If these materials are not biodegradable, what is their fate in the environment?"

### C. Manufacturing Defendants' Knowledge of the Toxic Nature of Their AFFF Is Uncovered Leading to Lower Thresholds

232.     As discussed above, neither 3M nor, on information and belief, the other defendants, complied with their obligations to notify EPA about the "substantial risk of injury to health or the environment" posed by their AFFF products containing PFOS/A. See TSCA § 8(e).

233.     In or around 1998, EPA began investigating the safety of PFOA and PFOS after some limited disclosures by 3M and others.

---

[20] Ansul Co., Final Report: Environmentally Improved AFFF, N00173-76-C-0295, Marinette, WI, Dec. 13, 1977
[21] 3MA00326828

234.     Beginning in 2009, EPA issued health advisories about the levels of exposure to PFOA and PFOS in drinking water that it believed were protective of public health. As described on EPA's website, "health advisories are non-enforceable and non-regulatory and provide technical information to states [,] agencies and other health officials on health effects, analytical methodologies, and treatment technologies associated with drinking water contamination." Drinking Water Health Advisories for PFOA and PFOS, What's A Health Advisory, available at https://www.epa.gov/ground-water-and-drinking-water/drinking-waterhealth-    advisories-pfoa-and-pfos (last visited June 5, 2018).

235.     The recommendations in EPA's health advisories evolved as EPA learned more about PFOA and PFOS. New York followed these changing advisories in implementing its own approach to investigating contamination from PFOA and PFOS.

236.     On January 8, 2009 EPA issued Provisional Health Advisories for PFOA and PFOS, advising that "action should be taken to reduce exposure" to drinking water containing levels of PFOA and PFOS exceeding 400 parts per trillion ("ppt") and 200 ppt, respectively. Provisional Health Advisories for Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonate (PFOS), available at https://www. cpa.gov/sites/productionlfiles/2015 0-9/documents/pfoa- pfos-provisional.pdf, at p. 1, n. 1 (last visited June 5, 2018).

237.     In January 2016, the New York Department of Environmental Conservation ("DEC") issued a rule designating one form of PFOA a "hazardous substance" under New York law. That designation enabled the State to use monies in the State Superfund program to respond to contamination from PFOA. As DEC and the New York State Department of Health ("DOH") continued to evaluate the scientific data, they determined that PFOS also met the definition of a

Case 1:22-cv-04234-PAE   Document 1-1   Filed 05/23/22   Page 46 of 67

hazardous substance under New York law. In April 2016, DEC issued a second rule designating both PFOA and PFOS as hazardous substances.

238.    On or around May 19, 2016, the EPA issued updated Drinking Water Health Advisories for PFOA and PFOS, recommending that drinking water concentrations for PFOA and PFOS, either singly or combined, should not exceed 70 ppt. See Lifetime Health Advisories and Health Effects Support Documents for PFOA and PFOS, 81 Fed. Reg. 33,250-51 (May 25, 2016).

239.    In June, 2018, the Agency for Toxic Substances and Disease Registry ("ATSDR") and EPA released a draft toxicological profile for PFOS and PFOA and recommended the drinking water advisory levels be lowered to **11 ppt for PFOA and 7 ppt for PFOS**.

#### D.  AFFF Usage in the City of Newburgh Area

240.    Upon information and belief, 3M, Tyco, National Foam and Chemguard each manufactured AFFF containing PFCs, among other reasons, for sale.

241.    3M, Tyco, National Foam and Chemguard sold AFFF that was used at Stewart Air National Guard Base and at what is today the Stewart International Airport.

242.    It is estimated that 75% of the military AFFF inventory is an ECF-based product. This is not surprising since for most of the past 30 years 3M was the primary supplier of AFFF.

243.    At any given time during its operation, Stewart Air National Guard Base and Stewart International Airport housed and used thousands of gallons of AFFF concentrate manufactured by 3M, Tyco, National Foam and Chemguard.

244.    The AFFF was expected to reach Stewart Air National Guard Base and Stewart International Airport without substantial change in the condition in which it was sold to the NYANG, and it did.

245.    The U.S. Air Force, NYANG, and civilian agencies conducted training exercises at Stewart International Airport and the Air National Guard Base including firefighting and explosion training that used of AFFF manufactured by 3M, Tyco, National Foam and Chemguard.

246.    From 2007 to date, Defendant Port Authority of New York and New Jersey was the lease, controller and operator of the Airport where the exercises took and were taking place using AFFF containing PFOA and PFOS.

247.    Additionally, from 2007 through date, Defendant Port Authority operated the airport and had SPDES permits for their discharge which did not permit the discharge of AFFF.

248.    During this time, AFFF containing PFOS and PFOA and/or its breakdown products was being discharged from the Port Authority's Stewart International Airport from its leased property and in violation of their SPDES permits.

249.    Upon information and belief, the instructions, warning labels, and material safety data sheets that were provided with the AFFF by 3M, Tyco, National Foam and Chemguard which, at least at significant times, did not fully describe the health and environmental hazards of AFFF which 3M, Tyco, and National Foam knew or should have known existed.

250.    Upon information and belief, 3M, Tyco, National Foam and Chemguard had known of these health and environmental hazards for years. For example, by the mid-1980s, 3M began a major program to review personnel handling of fluorochemicals and determined that fluorochemicals could bioaccumulate.

251.    In 1993, a published peer-reviewed study of 3M workers exposed to C-8 (PFOA) at a 3M manufacturing facility in Minnesota reported that "ten years of employment in exposed jobs was associated with a 3.3 fold increase … in prostate cancer mortality compared to no employment in [C-8] production. … If prostate cancer mortality is related to [C-8, C-8] may

increase prostate cancer mortality by altering reproductive hormones in male workers," thus making clear to Defendant by at least 1993 that C-8 was linked to increased cancer rates in C-8-exposed humans.

252.    3M, who was the predominant manufacturer of AFFF, ceased production of PFOS-based AFFF in 2002. Under pressure from the EPA, on May 16, 2000, 3M announced it would phase out production of two synthetic chemicals, PFOS and PFOA, that it had developed more than fifty years earlier.22

253.    An EPA internal memo on the day of 3M's phase out announcement stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term...[PFOS] appears to combine Persistence, Bioaccumulation, and Toxicity properties to an extraordinary degree."23

254.    In contrast, 3M's news release insisted that "our products are safe" while extolling their "principles of responsible environmental management" as driving the cessation of production.24

### D. Discovery of PFOS Contamination in City of Newburgh Area

255.    Between December 2013 and October 2014, the City of Newburgh tested the drinking water for PFOS as part of the U.S. Environmental Protection Agency's testing program for unregulated contaminants.

---

[22] 3M press release, "3M Phasing Out Some Of Its Specialty Materials", May 16, 2000, http://www.chemicalindustryarchives.org/dirtysecrets/scotchgard/pdfs/226-0641.pdf#page=1

[23] EPA internal memo, "Phaseout of PFOS", May 16, 2000, http://www.chemicalindustryarchives.org/dirtysecrets/scotchgard/pdfs/226-0629.pdf#page=2

[24] 3M press release, "3M Phasing Out Some Of Its Specialty Materials", May 16, 2000, http://www.chemicalindustryarchives.org/dirtysecrets/scotchgard/pdfs/226-0641.pdf#page=1

256.     The test results for PFOS and PFOA were reported to the EPA in 2014 and 2015.

257.     The NYDOH reviewed the data in early 2016 and retested the drinking water in March 2016. The NHDOH testing confirmed the presence of PFOS and PFOA but were below the health advisory level at the time.

258.     In March 2016, groundwater samples were also collected at the Stewart Air National Guard Base and Stewart International airport and analyzed for PFCs.

259.     The sample program showed that groundwater downgradient of the base has been impacted by PFOS and PFOA, likely associated with aqueous film forming foam (AFFF) which has been used at the base for fire-fighting, fire training, and fire suppression systems.

260.     Samples collected from existing monitoring wells at the Stewart Air National Guard Base showed concentrations as high as 3,160 parts per trillion (ppt).

261.     In May of 2016, the City of Newburgh declared a state of emergency due to the PFOS levels and stopped using Lake Washington as their source of potable water.

262.     In August 2016, Plaintiffs were advised that their household water was contaminated with PFCs at hazardous levels and advised to seek alternate drinking water supplies.

263.     Groundwater wells, retention ponds and soil tested within the Stewart Air National Guard Base Area have shown elevated concentrations of PFOS and PFOS from the AFFF.

**CAUSES OF ACTION FOR INDIVIDUAL CLAIMS**
**AS AND FOR A FIRST CAUSE OF ACTION:**
**<u>Negligence</u>**

264.     Plaintiff hereby repeats, realleges, and reiterates each allegation in the preceding paragraphs as if fully restated herein.

265.     This cause of action is brought pursuant to New York law.

266. Negligence may exist both as an omission as well as an affirmative act. A cause sounding in negligence allows for the recovery for an injury that was proximately caused by another's violation of a duty of reasonable care.

267. Defendants knew or should have known that exposure to PFOS and PFOA was hazardous to the environment and to human health.

268. Knowing of the dangerous and hazardous properties of the AFFF, Defendants had the duty to warn of the hazards associated with AFFF entering and poisoning the environment and drinking water.

269. Defendants knew or should have known that safety precautions would be required to prevent the release of PFOS and PFOA into the surrounding environment.

270. Defendants owed a duty to Plaintiffs to ensure that AFFF was used in a manner so as to prevent the exposure from creating an imminent and substantial health threat.

271. Upon learning of the release of the contaminants, Defendants owed Plaintiffs a duty to warn and notify Plaintiffs of the release of the contamination before it injured Plaintiffs and and their property and/or to act reasonably to negate and/or minimize the damage to Plaintiffs and their property.

272. Defendants breached their duty by allowing PFOS and PFOA to be released into the drinking water (both the municipal and private wells) of the City of Newburgh Area through their manufacturing of the AFFF and failure to warn and notify the end users of AFFF about the danger that PFOS and PFOA would enter into the environment and drinking water supplies.

273. As such, the Defendants, negligently, gross negligently, recklessly, willfully, wantonly, and/or intentionally breached their legal duties to the Plaintiffs, causing the contamination of drinking water in and around the residences of Plaintiffs.

274.    Defendants further breached the duties owed to the Plaintiffs by failing to take reasonable, adequate, and sufficient steps or actions to eliminate, correct, or remedy any contamination after it occurred.

275.    Defendants' failure to notify the Plaintiffs in a timely manner of the contamination of the City of Newburgh Area's drinking water, and, consequently, the presence of PFOA and PFOS in the real properties of Plaintiffs constitutes another breach of the duties that Defendant owed the Plaintiffs.

276.    Defendants' breaches of their duties were direct and proximate causes of Plaintiffs' damages and injuries to their homes and health.

277.    Defendant's breaches of their duties caused the drinking water in both Lake Washington and private wells to become contaminated with unsafe and dangerous levels of PFOS and PFOA, which was then ingested by Plaintiffs.

278.    Further, Defendants' breach of their duty to timely notify the community and act reasonably in warning of the presence of PFOS and PFOA in AFFF, Plaintiffs were forestalled from undertaking effective and immediate remedial measures, and Plaintiffs have expended and/or will be forced to expend significant resources to test, monitor, and remediate the effects of Defendants' negligence for many years into the future.

279.    Plaintiffs have suffered foreseeable injuries and damages as a proximate result of said Defendants' negligent breach of their duties as set forth above. At the time Defendant breached their duties to Plaintiffs, Defendants' acts and/or failures to act posed recognizable and foreseeable possibilities of danger to Plaintiffs so apparent as to entitle them to be protected against such actions or inactions.

Case 1:22-cv-04234-PAE   Document 1-1   Filed 05/23/22   Page 52 of 67

280.    Accordingly, Plaintiffs seek damages from Defendants, in an amount to be determined at trial, directly resulting from their injuries to their persons and property, in a sufficient amount to compensate them for the injuries and losses sustained and to restore Plaintiffs to their original position, including but not limited to the difference between the current value of their properties and such value if the harm had not been done, the cost of repair or restoration, injuries to persons, and actual, consequential, and nominal damages, flowing from the negligence which are the natural and proximate result of Defendant conduct in an amount to be proved at trial.

## AS AND FOR A SECOND CAUSE OF ACTION
### Private Nuisance (Private Well Owners Only)

281.    Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

282.    This cause of action is brought pursuant to the laws of New York.

283.    Plaintiffs, as described above, are owners of real property with the right of possession.

284.    Defendants, through the negligent, reckless and/or intentional acts and omissions alleged herein, have contaminated the private wells of these Plaintiffs.

285.    At all times relevant to the present cause of action, Defendant Port Authority of New York and New Jersey was the lease, controller and operator of Stewart International Airport where AFFF containing PFOA and PFOS was used for decades and which discharged and/or otherwise emanated PFOS contamination to Plaintiffs' drinking water.

286.    At the time the above-described, affirmative, voluntary, and intentional acts were performed by Defendants, Defendants had good reason to know or expect that large quantities of PFOA and PFOS would and/or could be introduced into the properties and water well of Plaintiffs.

287.    The above-described affirmative, voluntary, and intentional acts were performed with the reckless disregard of the potential for PFOA and PFOS to be disbursed through the water and onto the land and property of Plaintiffs.

288.    Defendants' negligent, reckless, willful, and/or wanton actions and/or intentional failures to act caused an unknown quantity of PFOS and possibly other toxic substances to be released into their drinking water.

289.    The introduction of unknown quantities of PFOA and PFOS onto the property and into the water wells of the Plaintiffs unreasonably interfered with the use and enjoyment of their property.

290.    The contamination of Plaintiffs' drinking water has interfered with the rights of Plaintiffs to use and enjoy their property.

291.    Indeed, this interference is substantial in nature. It has caused and is causing Plaintiffs to, inter alia, refrain from using water to drink, cook, or bathe, which has, in turn, caused significant inconvenience and expense. Defendants' conduct has also substantially interfered with Plaintiffs' ability to enjoy their property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that each Plaintiff so chooses.

292.    Defendants' negligent, reckless and/or intentional acts and omissions were unreasonable and constitute a continuous invasion of the property rights of Plaintiffs.

293.    The potential danger from the drinking water at their residences has caused the Plaintiffs significant inconvenience and expense, which will continue to run into the future.

294.    This constitutes a substantial interference with the use of the properties such that it is offensive and has caused significant inconvenience or annoyance.

295.     By reason of the foregoing, Defendants are liable to Plaintiffs for the damages that they have suffered as a result of Defendants' actions, the amount of which will be determined at trial, plus reasonable attorneys' fees and costs.

## AS AND FOR A THIRD CAUSE OF ACTION
### Failure to Warn

296.     Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

297.     This cause of action is brought pursuant to New York law.

298.     Defendant Port Authority of New York and New Jersey failed to employ reasonable care that a reasonably prudent person would have under the circumstances by allowing AFFF containing PFOS and PFOA to be transported, used, utilized, stored, dumped, handled and/or disposed while operating Stewart International Airport, in a manner that led to their release into the soil and local groundwater.

299.     Defendant Port Authority of New York and New Jersey knew or should have known that the manner in which AFFF was transported, used, utilized, stored, dumped, handled and/or disposed of at Stewart Air National Guard Base and Stewart International Airport would result in the contamination of the water supply in the City of Newburgh Area as a result of its proximity to Stewart Air National Guard Base and Stewart Airport.

300.     Further, this contamination then led to the exposure of residents of the City of Newburgh area to the toxins and increased their risk of numerous diseases as more fully set forth above.

301.     Defendant Port Authority of New York and New Jersey has negligently, gross negligently, recklessly, willfully, wantonly, and/or intentionally caused the immediate and

continuing contamination of soil and groundwater in and around the City of Newburgh Area that threatens to further contaminate Plaintiffs.

302. Defendant Port Authority of New York and New Jersey had a duty to warn Plaintiffs that the aforementioned releases of toxic substances including but not limited to PFOA and PFOS had occurred and that migration of the contaminants could foreseeably contaminate Lake Washington and its tributaries from which Plaintiffs rely upon for water.

303. Defendant Port Authority of New York and New Jersey breached their duty by failing to warn Plaintiffs that they had failed to prevent the migration of PFOA and PFOS from Stewart International Airport, which led and is leading to further migration of PFOS into Washington Lake.

304. As a result of Defendant Port Authority of New York and New Jersey's breach of their duty to warn the Plaintiffs, Plaintiffs were forestalled from undertaking effective and immediate remedial measures, and Plaintiffs will be forced to expend millions of dollars and significant resources to test, monitor and remediate the effects of Defendant's negligence for many years into the future.

305. Defendant Port Authority of New York and New Jersey's breach of its duty to warn was the actual and proximate cause of Plaintiffs' injuries and the actual, imminent, and substantial damage to Plaintiffs.

306. Plaintiffs' injuries are the natural and probable consequence of Defendant's breach of their duty.

307. Defendant's failure to warn was a direct and proximate cause of the environmental and health impacts from PFOS, and potentially other toxic substances, that came from the use,

storage, and discharge of AFFF and its constituents at Stewart Air National Guard Base and Stewart International Airport.

308.    As a result of Defendant Port Authority of New York and New Jersey's conduct and the resulting contamination, the value and marketability of the property of the Plaintiffs has been and will continue to be diminished.

309.    Alternatively, as a direct and proximate result of Defendant Port Authority of New York and New Jersey's acts and omissions, Plaintiffs have suffered the need for and the cost of remediation of their properties and/or mitigation systems for those properties, and the cost of alterative water.

310.    As a result of the contamination, Plaintiffs have lost the use and enjoyment of their properties and have suffered annoyance and discomfort, inconvenience and annoyance as a consequence of the contamination of their properties by Defendant Port Authority of New York and New Jersey.

311.    As a result of Defendant's conduct and the resulting contamination, the Plaintiffs have been injured in that they have suffered from illness as a result of their exposure to PFOS, PFOA, and potentially other toxic substances.

312.    As a result of Defendant's conduct and the resulting contamination, Plaintiffs have been injured in that their exposure to PFOS, PFOA, and possible other toxic substances caused them personal injuries in the form of illnesses and medical conditions.

### AS AND FOR A FOURTH CAUSE OF ACTION
**Products Liability, Failure to Warn**

313.    Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

314.    This cause of action is brought pursuant to New York law.

FILED: ORANGE COUNTY CLERK 04/01/2022 05:18 PM

Case 1:22-cv-04234-PAE   Document 1-1   Filed 05/23/22   Page 57 of 67

315.     Defendants knew or should have known that exposure to PFOA and PFOS was hazardous to the environment and to human health.

316.     Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF, containing PFC's, was hazardous to human health and the environment.

317.     Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF containing PFC's would result in the foreseeable contamination of the City's of Newburgh's water supply (i.e. Lake Washington and its tributaries) as a result of its proximity to the Stewart International Airport and Stewart Air National Guard Base.

318.     Knowing of the dangerous and hazardous properties of the AFFF, Defendants had the duty to warn of the hazards associated with AFFF entering and poisoning the environment and groundwater.

319.     Defendants failed to provide sufficient warning to the end users and the public of AFFF, including Plaintiffs, the City of Newburgh, Stewart International Airport and Stewart Air National Guard Base, that the use and storage of Defendants' product would cause the product to be released into the environment and cause the contamination of the environment, groundwater, and drinking water, with PFOA, PFOS, and potentially other toxic substances.

320.     Further, this contamination then led to the exposure of residents of the City of Newburgh to the toxins and increased their risk of numerous diseases as more fully set forth above.

321.     Adequate instructions and warnings on the AFFF products could have reduced or avoided these foreseeable risks of harm to both the residents of the City of Newburgh and their properties.

322.    Had Defendants provided adequate warnings, the residents and/or the City of Newburgh could have taken measures to avoid or lessen Plaintiffs' exposure.

323.    Had Defendants provided adequate warnings, the users of AFFF at Stewart International Airport and Stewart Air National Guard Base could have taken steps to reduce or prevent the release of PFOA, PFOS, and potentially other toxic substances into the environment, groundwater, and drinking water.

324.    Defendants' failure to warn was a direct and proximate cause of the environmental and health impacts from PFOA, PFOS, and potentially other toxic substances, that came from the use and storage of AFFF at Stewart International Airport and Stewart Air National Guard Base.

325.    As such, Defendants' failure to provide adequate and sufficient warnings for the AFFF that they manufactured, marketed, and sold renders the AFFF a defective product.

326.    As a result of Defendants' conduct and the resulting contamination, the value and marketability of the property of the Plaintiffs has been and will continue to be diminished.

327.    Alternatively, as a direct and proximate result of Defendants' conduct, Plaintiffs have suffered the need for and the cost of remediation of their properties and or mitigation systems for those properties, and the cost of alterative water.

328.    As a result of the contamination Plaintiffs have lost use and enjoyment of their properties and have suffered annoyance and discomfort, inconvenience and annoyance as a consequence of the contamination of their properties by Defendants.

329.    As a result of Defendants' conduct and the resulting contamination, the Plaintiffs have been injured in that their exposure to PFOS, PFOA, and potentially other toxic substances has caused them injury in the form of illnesses and medical conditions.

330. Defendants' acts were willful, wanton, reckless and/or conducted with a reckless indifference to the rights of Plaintiffs.

## AS AND FOR A FIFTH CAUSE OF ACTION
### Strict Product Liability

331. Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

332. This cause of action is brought pursuant to New York law.

333. Defendants knew or should have reasonably known that exposure to PFOA and PFOS was hazardous to the environment and to human health.

334. Defendants knew or should have reasonably known that the manner in which they were manufacturing, marketing, and selling AFFF, containing PFC's, was hazardous to human health and the environment.

335. Defendants knew or should have reasonably known that the manner in which they were manufacturing, marketing, and selling AFFF containing PFC's would result in the contamination of the City's of Newburgh's water supply (i.e. Lake Washington and its tributaries) as a result of its proximity to the Stewart International Airport and Stewart Air National Guard Base.

336. Knowing of the dangerous and hazardous properties of the AFFF, Defendants could have manufactured, marketed, and sold alternative designs or formulations of AFFF that did not contain PFC's.

337. These alternative designs and/or formulations were already available, practical, similar in cost and technologically feasible.

338. The use of these alternative designs would have reduced or prevented the reasonably foreseeable harm to persons and property that was caused by the Defendants' manufacture, marketing, and sale of AFFF that contained PFC's.

339. Additionally, the AFFF that was manufactured, marketed, and sold by the Defendants contained PFC's that were so toxic and unreasonably dangerous to human health and the environment, the toxic chemicals were so mobile and persistent, that the act of designing, formulating, manufacturing, marketing, and selling this product was unreasonably dangerous under the circumstances.

340. Further, this contamination then led to the exposure of residents of the City of Newburgh to the toxins and increased their risk of numerous diseases as more fully set forth above.

341. The AFFF manufactured, marketed, and sold by the Defendants was dangerous and defective because the foreseeable risk of harm could have been reduced or eliminated by the adoption of a reasonable, alternative design that was not unreasonably dangerous.

342. Defendants' defective design and formulation of AFFF was a direct and proximate cause of the environmental and health impacts from PFOA, PFOS, and potentially other toxic substances, that came from the use and storage of AFFF at the Stewart International Airport and Stewart Air National Guard Base.

343. As a result of Defendants' defective design and formulation of AFFF, the resulting contamination, the value and marketability of the property of the Plaintiffs has been and will continue to be diminished. Plaintiffs have suffered the need for and the cost of remediation of their properties and or mitigation systems for those properties, and the cost of alterative water.

344.     As a result of the contamination Plaintiffs have lost use and enjoyment of their properties and have suffered annoyance and discomfort, inconvenience and annoyance as a consequence of the contamination of their properties by Defendants.

345.     As a result of Defendants' defective design and formulation of AFFF, the resulting contamination, the Plaintiffs have been injured in that their exposure to PFOS, PFOA, and potentially other toxic substances has caused them personal injuries in the form of illnesses and medical conditions.

346.     As a result of Defendants' design and formulation of a defective product, Defendants are strictly liable in damages to the Plaintiffs.

347.     Defendants' acts were willful, wanton, reckless and/or conducted with a reckless indifference to the rights of Plaintiffs.

**AS AND FOR A SIXTH CAUSE OF ACTION**
**Trespass**

348.     Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

349.     This cause of action is brought pursuant to New York law.

350.     Defendant Port Authority of New York and New Jersey's intentional acts and/or omissions caused toxic substances, including but not limited to PFOS, to be spilled or disposed of and released into the ground at Stewart Air National Guard Base and Stewart International Airport and to enter the groundwater and aquifer beneath.

351.     Upon information and belief, Defendant Port Authority of New York and New Jersey had exclusive control over Stewart International Airport since 2007.

352.     PFOS has migrated and, upon information and belief, continue to further migrate from Stewart Air National Guard Base and Stewart International Airport to and invade Plaintiffs' properties and the water from which Plaintiffs receive their water.

353.     Defendant Port Authority of New York and New Jersey's intentional acts and omissions caused toxic substances to enter and trespass upon the land and subsurface waters of Plaintiffs without consent and interfere with Plaintiffs' exclusive possession and/or right of possession, resulting in a non-permissive entry onto Plaintiffs' land and subsurface waters.

354.     Upon information and belief, Defendant Port Authority of New York and New Jersey affirmatively, voluntarily and intentionally failed to act in a manner that would prevent the migration of the contaminants into Plaintiffs' properties.

355.     At the time of the above-described affirmative, voluntary and intentional acts and omissions, Defendant Port Authority of New York and New Jersey, knew or should have reasonably known that PFOA and PFOS would pass through the soil, groundwater, Lake Washington and the City of Newburgh's water supply system and contaminate Plaintiffs' properties.

356.     The intentional actions by Defendant Port Authority of New York and New Jersey resulted in the immediate and continued trespass, injury and damage to Plaintiffs, their water supply and/or properties from the introduction of PFOA and PFOS into the properties, pipes, and appliances of Plaintiffs.

357.     Defendant Port Authority of New York and New Jersey knew or should have known that failing to properly remediate the contamination would result in a further trespass upon Plaintiffs' properties and exacerbate the harm to Plaintiffs.

358.    As a direct result of the foregoing trespass by Defendant Port Authority of New York and New Jersey, Plaintiffs have suffered injuries including, but not limited to: property damage, the difference between the current value of their property and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, investigative costs, additional testing costs, treatment costs, loss of use of water, purchase of bottled water, and purchase of filtration systems.

**Market Share Liability, Alternative Liability, Concert of Action, Enterprise Liability**

359.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

360.    Defendants in this action are manufacturers that control a substantial share of the market for AFFF products containing PFOA and/or PFOS in the United States and are jointly responsible for the contamination of Plaintiffs' drinking water and for causing the damages and injuries complained of in this Complaint.

361.    Market share liability attaches to all Defendants and the liability of each should be assigned according to its percentage of the market for AFF products containing PFOA and/or PFOS at issue in this Complaint.

362.    PFOA and PFOS are fungible; it is impossible to identify the exact Defendant who manufactured any given batch of PFOA/S found free in the drinking water, and, each of these Defendants participated in a state-wide and national market for PFOA and/or PFOS during the relevant time.

363.    Concert of action liability attaches to all Defendants, each of which participated in a common plan to commit the torts alleged herein and each of which acted tortuously in pursuance

of the common plan to knowingly manufacture and sell inherently dangerous AFFF containing PFOA and PFOS.

364. Enterprise liability attaches to all of the named Defendants for casting defective products into the stream of commerce.

## **DAMAGES SOUGHT**

365. Plaintiffs re-allege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

366. The Plaintiffs have been caused to be exposed to elevated and hazardous levels of toxic and hazardous substances, including but not limited to PFOS.

367. This exposure has resulted in real injury in the form of diseases and medical conditions suffered by the Plaintiffs.

368. Plaintiffs have sustained and will continue to sustain damages to their property as a result of Defendants' actions. As a result, Plaintiffs seek monetary damages for each violation of the First through Sixth Claims for Relief. In particular, Plaintiffs seek (i) monetary damages to compensate Plaintiffs for the diminution in value of their property caused by Defendants' conduct; (ii) monetary damages to compensate Plaintiffs for the loss of the use and enjoyment of their properties caused by Defendants' conduct; (iii) monetary damages reflecting the cost to remediate Plaintiffs' property of the contamination caused by Defendants' conduct; (iv) monetary damages to compensate Plaintiffs for the loss of quality of life caused by Defendants' conduct; and (v) monetary damages to compensate Plaintiffs for their injuries, pain and suffering, and costs they incurred seeking and receiving medical attention and treatment for their injuries sustained as a result of the contamination caused Defendants' conduct.

**Fear of Cancer**

369.    Each and every Plaintiff has a justifiable and actual fear of developing cancer as a result of said exposure and bioaccumulation of PFOS/A in their bodies. With reasonable probability, the prospective, feared, and anticipated consequences may be expected to flow from the past harm.

370.    The degree of probability that Plaintiffs will develop cancers is such that there is a reasonable certainty that such cancers will develop at some future date, thus entitling Plaintiffs to recover from Defendants for apprehended consequences that are not presently manifested.

371.    A rational basis exists between Plaintiffs' exposure to the above-described toxins and contaminants, and the currently manifested fear of developing cancer in the future.

372.    To the extent that Defendants' actions resulted in the discharge and/or release of toxic contaminants into the soil and groundwater, thereby entering and injuring Plaintiffs' physical and mental well-being and their economic interests, Defendants are liable.

## PUNITIVE DAMAGES

373.    Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

374.    Upon information and belief, Defendants engaged in willful, wanton, malicious, and or/reckless conduct that caused the foregoing property damage, nuisances, and injuries upon the persons and properties of Plaintiffs, disregarding their protected rights.

375.    Defendants' willful, wanton, malicious, and/or reckless conduct includes but is not limited to Defendants' failure to take all reasonable measures to ensure PFOS/A-containing AFFF would not be released into Plaintiffs' drinking water and into their bodies.

376.    Defendants have caused great harm to the property and water supplies of Plaintiffs and demonstrated an outrageous conscious disregard for their safety with implied malice, warranting the imposition of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs demand judgment against Defendants, and each of them, jointly and severally, and request the following relief from the Court:

A. a declaration that Defendants acted with negligence, gross negligence, and/or willful, wanton, and careless disregard for the health, safety, and property of Plaintiffs.

B. an award to Plaintiffs of compensatory, exemplary, consequential, nominal, and punitive damages;

C. an order for an award of attorney fees and costs, as provided by law;

D. an award of pre-judgment and post-judgment interest as provided by law, and

E. an order for all such other relief the Court deems just and proper.

### JURY DEMAND

Plaintiffs demand a trial by jury of all claims asserted in this Complaint.

Dated: New York, New York
       April 1, 2022

Respectfully submitted,

**NAPOLI SHKOLNIK, PLLC**

By: /s/ Patrick Lanciotti
Patrick Lanciotti, Esq.
360 Lexington Avenue, 11th Floor
New York, NY 10017
planciotti@napolilaw.com

Paul J. Napoli, Esq.
270 Muñoz Rivera Avenue, Suite 201
Hato Rey, Puerto Rico 00918
(833) 271-4502
pnapoli@nsprlaw.com

Andrew Croner
Patrick Lanciotti, Esq.
360 Lexington Avenue, 11th Floor
New York, NY 10017
acroner@napolilaw.com